# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5829 | **DATE** | 02/09/2004 |
| **CASE TITLE** | Fidelity and Deposit Co of Maryland and AHAC v. ROTEC Industries | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Plaintiffs' Motion for Summary Judgment (doc. # 32)
> Defendants' Motion fo Summary Judgment (doc. # 33)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] . Enter memorandum opinion and order. For the attached reasons, Plaintiffs' motion for summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED. Terminating Case. Any other pending motions are denied as moot.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | Document Number |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | FEB 1 0 2004 | |
| ✓ | Docketing to mail notices. | date docketed | 40 |
| √ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| JHC | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FIDELITY AND DEPOSIT COMPANY OF )
MARYLAND, a Maryland Corporation )
and AMERICAN HOME ASSURANCE )
COMPANY, a New York Corporation )
)
      Plaintiffs, )
)
)
      v. )   Case No. 01 C 5829
)
)   The Honorable William J. Hibbler
ROTEC INDUSTRIES, INC., )
a Delaware Corporation )
)
      Defendant. )
)

DOCKETED
FEB 10 2004

## MEMORANDUM OPINION AND ORDER

Fidelity and Deposit Company of Maryland (Fidelity) and American Home

Assurance Company (AHAC) received certain assets of the Guy F. Atkinson Company

of California and the ATKN Company (collectively, Atkinson) when those companies

filed for Chapter 11 bankruptcy. Fidelity and AHAC (collectively, Plaintiffs) claim that

among the assets transferred to them was Atkinson's right to receive payment pursuant

to a contract between it and Defendant ROTEC Industries, Inc. Fidelity and AHAC claim

that ROTEC has since breached the contract, by refusing to pay them what it owed

Atkinson. The parties have filed cross motions for summary judgment.

### I. Factual Background

1

ROTEC manufactures and supplies concrete delivery and placement equipment for construction projects. In 1994 and 1995, ROTEC sought to contract with the Three Gorges Dam Project Corporation and related entities (collectively, Three Gorges Corporation or TGC) to provide equipment and services to the Three Gorges Dam hydroelectric project on the Yangtze River in China (the Project). In 1995, after ROTEC had already established a relationship with the Project, the TGC decided to invite other companies to bid on future contracts to supply the Project with construction equipment. At that point, ROTEC decided to enlist another company to assist it with its bid preparation and to bolster its bid by providing assurance to the TGC that ROTEC had the resources to complete its work for the Project. Among others, ROTEC contacted the Brazilian Corporation Odebresch, the Bechtel Corporation, Morrison Knutsen, and Atkinson. On January 10, 1996, ROTEC and Atkinson entered into an agreement, referred to as the Memorandum of Understanding (MOU).

At the beginning of the MOU, Atkinson and ROTEC spell out the contractual relationship between the parties: "ROTEC intends to submit to the Three Gorges Corporation a bid, with Atkinson and Mitsui as subcontractors, . . . and the Parties intend to define and establish through contract their respective rights, responsibilities, duties and obligations pertaining to performance thereunder." (Def. Mem. in Supp. of Mot. Summ. J., Ex. B (Def. Ex. B) § 1.03). The MOU next describes two objectives: "to cooperate in the preparing a proposal for submission to the Three Gorges Corporation in order to obtain the award of a contract . . . and to cooperate in taking all other actions necessary to performance thereunder . . . ." (Def. Ex. B § 2.01). The MOU also outlines

2

tasks for Atkinson and ROTEC to complete with regard to the submission of the bid. Atkinson was to: 1) submit to ROTEC responsive cost and technical data related to activities it would perform under the proposal; 2) supply qualified personnel to draft portions of the proposal within its area of responsibility; and 3) ensure the availability of management and technical personnel to assist ROTEC with negotiations with the TGC. (Def. Ex. B § 3.01).

ROTEC and Atkinson agreed that they could not "sell, assign, mortgage, encumber, or in any way dispose of any of its interests under [the] MOU without the prior written consent of the other Parties." (Def. Ex. B. § 6.02). ROTEC and Atkinson also ensured that the MOU contained an integration clause, expressing the parties' intent that the MOU constituted the entire agreement between the parties. (Def. Ex. B § 6.05).

On the same date as it entered into the MOU with Atkinson, ROTEC also submitted a bid to the TGC.[1] While the TGC reviewed the bid, Atkinson and ROTEC continued negotiate and define the parties' obligations with respect to any potential contract they might secure with the TGC, as §1.03 of the MOU directed them to do. To this end, Atkinson and ROTEC agreed shortly after submitting the bid to the first of two supplements to the MOU. The First Supplement comments that it was "subject to the award to ROTEC of a contract (the 'Contract') for the Main Equipment for Dam and

---

[1] ROTEC denies that Atkinson provided any assistance in preparing the bid other than allowing the use of its name. (Def. L.R. 56.1(b)(3)(A) Response ¶ 7). But the documents submitted to TGC demonstrates that ROTEC's denial is without foundation. ROTEC's proposal states that it "was prepared by drawing on the experience and expertise of ROTEC Industries, Guy F. Atkinson Company and independent construction experts." (Pl. Mem. in Supp. of Mot. Summ. J., Ex. 8). The Court finds that the undisputed facts demonstrate that Atkinson did provide assistance in preparing the bid.

3

Powerhouse Concrete Construction, Stage II, Bid No. TGP-CM/9508 (the 'Project')." (Pl. Mem. in Supp. of Mot. for Summ. J., Ex. 9 (Pl. Ex. 9)). The First Supplement contains four numbered paragraphs that detail ROTEC's and Atkinson's obligations with respect to their efforts to secure a contract with the TGC, the first two of which are relevant to the disposition of this motion. Paragraph One states that Atkinson shall be paid a fee for the use of its name. It reads in relevant part: "It is agreed that Atkinson shall be paid a fee by ROTEC for the use of its name by ROTEC with respect to the Project. The amount of said fee shall be subject to negotiation and may be affected by ROTEC's negotiations with China Yangtze Three Gorges Development Corporation . . ., but constitutes a material part of the Performance Agreement referenced in the MOU and as such must be mutually acceptable." (Pl. Ex. 9, ¶ 1). Paragraph 2 states that Atkinson shall be paid an additional fee "for its *involvement* in the Project [,which shall] include providing advice and technical support services under subcontract to ROTEC in connection with ROTEC's performance under the Contract." (Pl. Ex. 9, ¶ 2) (emphasis added).

But ROTEC's and Atkinson's initial attempt to land a contract with the TGC failed. Undaunted, ROTEC submitted a second bid,[2] and on November 1, 1996, were awarded a contract with TGC with a value of $30,515,319 (Contract No. 96BU185-S2012). In July 1997, Atkinson and ROTEC executed the Second Supplement to the MOU. The Second Supplement confirms "the discussions and agreement reached on July 2, 1997 regarding

---

[2] Neither party supplies a copy of ROTEC's the proposed bid with its summary judgment documents. Further, neither party specifies whether ROTEC used Atkinson's name on this bid. However, ROTEC claims that Atkinson did not assist in the preparation of any bids after the intitial bid, and the Plaintiffs offer no evidence to dispute this claim.

4

Atkinson's participation with ROTEC on the provision of 'Main Equipment for Dam and Powerhouse Concrete Construction of Stage II Works for the Yangtze Three Gorges Project,' (Contract No. 96BU185-S2012)" and amends the First Supplement. (Pl. Mem. in Supp. Mot. Summ. J., Ex. 11 (Pl. Ex. 11)). The Second Supplement clarifies that "[t]he fee that ROTEC will pay Atkinson for use of Atkinson's name will be US $1 million based on the present contract value of $30,515,319." (Pl. Ex. 11, ¶ 1). It goes on to suggest that ROTEC will attempt to increase the size of the TGC contract and, if successful, pay Atkinson a "further fee of 5% of the approximately US$15 million involved in these additional items [line conveyers and conveyors to Potain Cranes]" and an additional fee for any other contracts that ROTEC might obtain with the TGC. (Pl. Ex. 11, ¶ 1). The Second Supplement also revises Paragraphs Two and Three of the First Supplement, stating that "these provisions will be reviewed when it becomes clearer as to Atkinson's involvement in the contract." (Pl. Ex. 11, ¶ 2 & 3).

ROTEC and Atkinson agreed that ROTEC would pay Atkinson the amounts described in Paragraph 1 following the shipment of the items to the Project and the receipt of letters of credit from the TGC. (Pl. Ex. 11, ¶ 1). In fact, shortly after executing the Second Supplement, ROTEC received the first of several letters of credit from the TGC, and, as directed by the MOU and its supplements, sent Atkinson a check for $128,867.93, its pro-rated share of the $1,000,000 described in Paragraph 1 of the Supplements. (Pl. Mem. in Supp. Mot. Summ. J., Ex. 13).

On August 10, 1997, Atkinson filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Northern District of California. After Atkinson filed for

bankruptcy, it performed no other tasks under the MOU or the Supplements. Atkinson's Amended Joint Plan of Reorganization expressed its intent to reject all executory contracts not specifically identified and listed in an exhibit to the plan. (Def. Mem. in Supp. Mot. Sum. J., Ex H § 6.1(b)). The plan, however, gave Fidelity and AHAC the right to designate, prior to confirmation, that any agreements under which Atkinson formed a joint venture shall be neither assumed nor rejected. (Def. Mem. in Supp. Mot. Summ. J., Ex. H § 6.1(c)). In March 2000, the Bankruptcy Court confirmed Atkinson's plan for reorganization. The order confirming the plan observed that all executory contracts not listed by Atkinson in exhibit A to the plan or by Fidelity and AHAC in exhibit A to the confirmation order were rejected. (Def. Mem. in Supp. Sum. Mot. J., Ex. I at 12).

During the pendency of Atkinson's bankruptcy, ROTEC received the remaining letters of credit associated with the November 1996 contract with the TGC. In addition, ROTEC secured additional contracts with the TGC. In May 1998, the TGC awarded ROTEC a contract for $21,852,343 to provide line conveyors for the Project. In October 2000, the TGC awarded ROTEC a contract for $640,000. ROTEC received a final contract from the TGC in December 2001. Meanwhile, Atkinson took no steps to assist ROTEC in securing these additional contracts or in performing any remaining obligations under the MOU.

And even though ROTEC paid Atkinson $128,867.93 when it received the first letter of credit from the TGC, it did not pay Atkinson any more of the $1,000,000 agreed to by ROTEC and Atkinson in the Second Supplement. In September 1999, Atkinson's Chief Financial Officer, Daniel Ratto, sent a letter to ROTEC President Steven Ledger

6

inquiring about whether ROTEC had ever remitted $871,132.07 that Atkinson might have been due under the MOU and whether ROTEC had successfully increased the size of its contract with the TGC. Ledger did not respond to Ratto's letter, and Ratto elected not to pursue the matter any further.

After acquiring certain assets of Atkinson through the bankruptcy proceedings, Fidelity and AHAC sued ROTEC, alleging that ROTEC owed them $871,132 for the November 1996 contract, $1,050,000 for the May 1998 contract, and 5% of the October 2000 and December 2001 contracts. Both parties now move for summary judgment.

## II. Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In a summary judgment action, the moving party shoulders the initial burden of production. It must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). When the movant satisfies that burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "If no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461

(7th Cir. 1997). In considering cross-motions for summary judgment, the Court must construe all inferences in favor of the party against whom the motion under consideration is made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

Summary judgment is a particularly appropriate mechanism for resolving cases involving the interpretation of written contracts. *International Union of United Auto., Aerospace and Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003); *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir. 1998). That is because if a contract is susceptible to only one reasonable interpretation, it is unambiguous. And "'[i]f a contract is unambiguous, by definition no material issues of fact exist regarding the contract's interpretation; the interpretation is a question of law for the court.'" *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 378 n.1 (7th Cir. 2000) (citing *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988)).

### III. Applicable Law

Plaintiffs assert that California law applies (though they argue that both California and Illinois law support their position). Defendants make no assertion which state's law applies, but consistently cite Illinois law.[3] Federal courts sitting in diversity apply the conflict-of-laws rules of the forum state to determine the applicable substantive law.

---

[3] The contract has a poorly worded choice of law provision, which directs the parties to apply the law of the "United States of America" and the law of the Peoples Republic of China. Neither party suggests that the law of the Peoples Republic of China governs the dispute, and the contract also specifies that in the event of a conflict, the laws of the United States apply. Neither party interprets the contract to require the court to apply federal common law regarding contract interpretation. Instead, both parties apply the law of the several states that make up the United States of America.

Jupiter Aluminum Corp. v. Home Ins. Co., 225 F.3d 868, 873 (7th Cir.2000). Illinois courts employ the "most significant contacts" test to determine the governing substantive law for the contract. Factors a court should consider include the place the contract was executed, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the domicile of the parties. Curran v. Kwon, 153 F.3d 481, 488 (7th Cir.1998). In this case, the MOU was negotiated in Illinois by ROTEC (domiciled in Illinois) and Atkinson (domiciled in California). The First Supplement was negotiated on the phone by representatives located in Illinois and California, while the second supplement was negotiated in California. The two supplements are short addendums to the MOU, each adding only a few paragraphs to an eight page contract. Thus, the Court concludes that the place of execution weighs in favor of applying Illinois law. Further, the MOU was executed in Illinois and ROTEC provided the final signature on both the First and Second Supplements in Illinois. The subject matter of the contract relates to the procurement of contracts with the TGC, which is located in China, and thus the Court concludes that the subject matter of the contract is not related to either California or Illinois. And although much of the contract was to be performed in China, the preparation of the bid was mostly performed by ROTEC in Illinois. Lastly, Atkinson had its principal place of business in California and ROTEC had ties to Illinois. But Atkinson, though a party to the contract, is not a party to this lawsuit, and any contact with California is thereby mitigated. The Court concludes that Illinois is the state with the most significant contacts to the contract and will thus apply Illinois law to resolve the dispute.

9

## IV. Discussion

When construing contracts, courts must ascertain and give effect to the parties' intent. *USG Corp. v. Sterling Plumbing Group, Inc.*, 247 Ill. App. 3d 316, 318, 617 N.E.2d 69, 70 (1993). And if the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447, 581 N.E.2d 664, 667 (1991). Under Illinois law, whether a contract is ambiguous is a question of law for the court. *Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 888, 652 N.E.2d 1233 (1995). The parties' disagreement regarding the interpretation of a contract does not make it ambiguous. *Meyer*, 273 Ill. App. 3d at 888. Instead, a contract term is ambiguous when it may reasonably be interpreted in more than one way. *Dean Management, Inc. v. TBS Const., Inc.*, 339 Ill. App. 3d 263, 269, 790 N.E.2d 934,939 (2003). If the language of the contract is facially unambiguous, then the "four corners" rule requires the trial court to interpret the contract as a matter of law without the use of parol evidence. *Dean Management, Inc*, 339 Ill. App. 3d at 269.

Here, the parties agree on the material facts, but each offers a different interpretation of the contract, both claiming that its interpretation is the only reasonable one. The parties' dispute centers on whether the MOU forming the contract between Atkinson and ROTEC was an executory or an executed contract. Under Atkinson's bankruptcy plan , Fidelity an d AHAC received assets categorized by the plan as "transferred assets," including, according to Fidelity and AHAC, any contractual right to payment that Atkinson possessed in regards to an executed contract. However,

Atkinson's bankruptcy plan also called for the rejection of all executory contracts except for those specifically listed and assumed. Because Atkinson did not list the MOU in the appendix to its bankruptcy plan identifying contracts it would assume and because neither Fidelity nor AHAC used their authority under § 6.1(c) of the plan to designate the MOU as neither rejected nor assumed, Fidelity and AHAC could have received Atkinson's contractual right to payment under the MOU *only if* that right was part of an executed contract. Fidelity and AHAC, of course, argue that the MOU was an executed contract, and only ROTEC's obligation to pay Atkinson was incomplete, and thus they received Atkinson's right to payment because it was part of the assets Atkinson transferred to them in its Chapter 11 plan. ROTEC, on the other hand, argues that the MOU was an executory contract, and thus it had been rejected by Atkinson and nothing was transferred to Fidelity and AHAC.

Fidelity and AHAC's theory that the MOU was an executed contract is as follows. First, Fidelity and AHAC acknowledge that at least a portion of Atkinson's obligations under the MOU went unperformed. No matter, according to the Plaintiffs, because the contract was divisible. The Plaintiffs suggest that the MOU contained two independent objectives: (1) to cooperate in preparing a proposal to the TGC to obtain a contract with them; (2) to cooperate in taking any action necessary to perform any contract awarded to ROTEC and Atkinson by the TGC. The Plaintiffs further argue that while Atkinson failed to perform its obligations under the second objective, it fully performed its obligations under the first, and thus was entitled to full payment from Defendant with regard to that objective. ROTEC interprets the contract differently. According to

ROTEC, the contract is not divisible and the plain language of the contract shows that Atkinson's performance was intended to be ongoing and that Atkinson was thus required to do more than allow its name to be used on the bids submitted to the TGC to fulfill its obligations under the contract.

A divisible contract is one in which both parties have divided up their performance into units such that each past performance is the rough compensation for a corresponding past performance by the other party. *Trapkus v. Edstrom's Inc.*, 140 Ill. App. 3d 720, 727, 489 N.E.2d 340, 346 (1986). Whether a contract is entire or divisible depends on the intentions of the parties. *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 988, 1018, 738 N.E.2d 524, 538-39 (2000); *Kimco Corp. v. Murdoch, Coll and Lillibridge, Inc.*, 313 Ill. App. 3d 768, 773, 730 N.E. 2d 1143, 1147 (2000). But since parties rarely consider explicitly the question of divisibility, as is the case here, the test is whether, "'had the parties thought of it, they would be willing to exchange the part performance irrespective of what transpired subsequently or whether the divisions made are merely for the purpose of requiring periodic payments as the work progresses.'" *Kimco Corp.*, 730 N.E.2d at 1147 (quoting *Trapkus*, 489 N.E.2d at 346). The mere fact that a contract calls for performance in installments does not make it divisible. *Trapkus*, 489 N.E.2d at 346. Rather, a contract is not divisible if the parties assented to all the promises as a single whole and if striking any promise or set of promises would destroy the basis of the bargain. *Klubeck v. Division Med. X-Ray, Inc.*, 439 N.E.2d 506, 108 Ill. App. 3d 630 (1983). Where a contract contemplates and intends that the parties are to be performed as a whole, it is not divisible. *Trapkus*, 489 N.E. 2d

12

at 346; *Klubeck*, 439 N.E.2d at 636. The contract between Atkinson and ROTEC does in fact identify two distinct objectives and also separately assigns a value for Atkinson's performance related to the first objective. On other hand, the contract clearly contemplates an ongoing relationship between Atkinson and ROTEC under which Atkinson would assist ROTEC in securing bids with the TGC and also help ROTEC ensure that any contract with TGC was fulfilled to TGC's satisfaction. It is clear that ROTEC contracted for more than just the use of Atkinson's name. Whether the contract between Atkinson and ROTEC was entire or divisible is a close question, but ultimately not one the Court need answer because the Court finds that the Plaintiffs' claim that Atkinson fully performed its obligations with regard to Paragraph 1 of the First and Second Supplements to be without merit. In other words, even if the contract were divisible, the Court would nonetheless find it to be executory.

The Plaintiffs' theory that the contract was executed rests upon its interpretation of Paragraph 1 of the Supplements. The Plaintiffs suggest that Paragraph 1 of the First Supplement concerns Atkinson's and ROTEC's agreement regarding the first objective of the MOU—to cooperate to secure a contract with the TGC. According to the Plaintiffs' interpretation, Paragraph 1 requires ROTEC to pay Atkinson $1,000,000 for the use of its name in the preparation of a bid proposal to obtain a contract with the TGC and also to pay Atkinson a percentage of future contract amounts. The Plaintiffs interpret Atkinson's duties under Paragraph 1 to have been completed solely by allowing its name to be used on the initial bid to the TGC.

13

ROTEC protests that Paragraph 1 of the Supplements does not represent an agreement to pay Atkinson simply for the use of its name and insists that Paragraph 1 required Atkinson to fulfill other obligations. ROTEC points to various sources of extrinsic evidence to support its position, but of course the Court may not rely on extrinsic evidence to interpret an unambiguous provision. ROTEC's interpretation of Paragraph 1 ignores the plain language of the contract. Paragraph 1 the First Supplement states that "[i]t is agreed that Atkinson shall be paid a fee by ROTEC for the use of its name by ROTEC with respect to the Project." The Second Supplement clarifies the amount of the fee as $1,000,000 for the first contract with TGC and 5% of additional contracts. ROTEC argues that it never agreed to pay Atkinson solely for the use of its name, but Paragraph 1 contemplates just such an arrangement, and could not state this intent with any greater clarity. Moreover, Paragraph 2 makes it even more clear that the fee described in Paragraph 1 is to be paid to Atkinson for the use of its name. In Paragraph 2 of the Supplements, ROTEC agrees to pay Atkinson an additional fee "for its *involvement* in the Project." The fact that Atkinson and ROTEC contemplated paying Atkinson an additional fee for its involvement in the Project makes the provision in Paragraph 1 unambiguous. Read as a whole it is clear that ROTEC and Atkinson intended that Paragraph 1 require ROTEC to pay Atkinson a fee for the use of its name.

But the Plaintiffs' interpretation of Paragraph 1 also is not correct because ignores the plain language of the contract. Fidelity and AHAC suggest that the only obligation Atkinson had under Paragraph 1 was to allow ROTEC to use its name in the bid it submitted to the TGC. But Atkinson's duties under Paragraph 1 are not so narrow and

14

the Plaintiffs' interpretation renders certain language in Paragraph 1 superfluous. Paragraph 1 requires Atkinson to allow ROTEC to use its name *"with respect to the Project"* in order to be paid the $1,000,000 fee. The inclusion of the language "with respect to the project" explicitly requires Atkinson to allow ROTEC to use its name not just in the process of submitting bids to the TGC but throughout the work ROTEC performs for the TGC. In other words, ROTEC's contract with Atkinson required Atkinson to supply a visible reminder to the TGC that ROTEC had the support of Atkinson as it performed its duties under the contract. And this is no small bargain. The TGC might rightly become concerned if only ROTEC showed up to deliver the goods, after it had accepted a bid from ROTEC *and* Atkinson, and worry that it would not receive the services for which it contracted. Thus, contrary to the Plaintiffs' assertion, Atkinson's duties were not fully performed after ROTEC submitted the bid to the TGC, they were instead ongoing. So long as ROTEC's involvement with the Project continued, Atkinson was obligated by the MOU and its Supplements to allow ROTEC to use its name with respect to the work it did for the Project.

Because Atkinson had not fully performed its duties under the MOU and its Supplements, the contract it had with ROTEC was executory. In its bankruptcy plan, Atkinson rejected all executory contracts unless it specifically assumed them. There was a provision of the plan that allowed Fidelity and AHAC to designate executory contracts as neither assumed nor rejected, but neither company so designated the MOU with ROTEC. Therefore, the Plaintiffs' claim that they acquired Atkinson's right to payment under the MOU during Atkinson's bankruptcy reorganization is without merit.

The Court concludes that the MOU and its Supplements are unambiguous and further that ROTEC is entitled to summary judgment. The claims of Fidelity and AHAC are dismissed with prejudice.

IT IS SO ORDERED.

_2 / 9 / 04_

Dated

The Honorable William J. Hibbler
United States District Court